UNITED STATES v. BALTIMORE & O. R. CO.

(District Court, W. D. Pennsylvania. January 18, 1910.)

No. 85.

1. RAILROADS (§ 254*)—SAFETY APPLIANCE ACT—CONSTRUCTION—USE OF POWER BRAKES.

The provision of the Safety Appliance Act of March 2, 1893, c. 196, § 1, 27 Stat. 531 (U. S. Comp. St. 1901, p. 3174), requiring railroad trains used in interstate traffic to have a sufficient number of cars equipped with power or train brakes so that the engineer can control their speed without requiring brakemen to use the hand brake for that purpose, as amended by Act March 2, 1903, c. 976, § 2, 32 Stat. 943 (U. S. Comp. St. Supp. 1909, p. 1144), fixing 50 per cent. of the cars in each train as the minimum number which must be so equipped, which number was increased to 75 per cent. by order of the Interstate Commerce Commission, cannot be construed to prohibit the use of hand brakes, and evidence that under a gen-

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

eral order of a railroad company brakemen were required to set hand brakes on trains while going down a certain grade as a precaution against accidents is not sufficient to establish a violation of the statute, there being no claim or evidence that the required percentage of cars were not equipped with power brakes.

[Ed. Note.—For other cases, see Railroads, Dec. Dig. § 254.*]

2. RAILROADS (§ 229*)—SAFETY APPLIANCE ACT—CONSTRUCTION—USE OF POWER BRAKES.

The Safety Appliance Act of March 2, 1903, c. 976, § 2, 32 Stat. 943 (U. S. Comp. St. Supp. 1909, p. 1144), providing that at least 50 per cent. of the cars in every train shall have their brakes used and operated by the engineer, and that "all power braked cars in such train which are associated together with said fifty per centum shall have their brakes so used and operated," is not violated where the required percentage of cars in a train are equipped with power brakes which are used because the train also contains other cars so equipped, but the brakes of which are out of repair and cannot be operated, and are therefore cut out.

[Ed. Note.—For other cases, see Railroads, Dec. Dig. § 229.*]

Action by the United States against the Baltimore & Ohio Railroad Company. On motion to take off nonsuit. Motion denied.

John H. Jordan, for the United States.
McCleave & Wendt, for Baltimore & O. R. Co.

ORR, District Judge. This is an action to recover penalties for violations of the provisions of what is commonly called the "Safety Appliance Act." Act March 2, 1893, c. 196, 27 Stat. 531 (U. S. Comp. St. 1901, p. 3174). The plaintiff's statement sets forth 37 causes of action. and demands $2,200 aggregate penalties. At the trial the plaintiff elected to proceed on 22 causes only. These causes of action are the second, third, fifth, seventh, eighth, tenth, eleventh, thirteenth, fifteenth, seventeenth, nineteenth, twentieth, twenty-second, twenty-fourth, twenty-fifth, twenty-seventh, twenty-ninth, thirty-first, thirty-second, thirty-third, thirty-fifth, and thirty-sixth. Of these 21 are alike and 1 only, being the second cause of action, is in a class by itself. The 21 alleged violations of the first section of the act, which provides that it shall be unlawful to run any train in interstate traffic "that has not a sufficient number of cars in it so equipped with power or train brakes that the engineer on the locomotive drawing such train can control its speed without requiring brakemen to use the common hand brake for that purpose." The second cause alleges a violation of the second section of the act amending said act, passed March 2, 1903 (Act March 2, 1903, c. 976, 32 Stat. 943 [U. S. Comp. St. Supp. 1909, p. 1144]), and the order of the Interstate Commerce Commission relating thereto, which provide that "when any train is operated with power or train brakes, not less than 75% of the cars in such train shall have their brakes used and operated by the engineer of the locomotive drawing such train, and all power braked cars in such train, which are associated together with said 75% shall have their brakes so used and operated." After plaintiff had closed its testimony the defendant moved the court for judgment of nonsuit for the reason that there was not evidence sufficient to show a violation of the pro-

visions of the statute by the company. The court sustained the motion. And now upon the motion to take off the nonsuit, it must be determined whether the trial judge erred. This necessarily involves construction of the acts of Congress as well as consideration of the allegations and proofs. The purpose of the act as stated in its title is "to promote the safety of employees and travelers upon railroads," etc. The mischiefs it was intended to remedy are well known and need not be dwelt upon. It has received, as it should, such liberal construction as to best promote the ends desired. This court is now asked to rule that it forbids the use of a hand brake on trains except in "emergencies arising from unforeseen or wholly exceptional causes." It is urged that the habitual use of hand brakes on Sand Patch grade in accordance with written orders which were offered in evidence is evidence that the trains have not a sufficient number of cars so equipped with power or train brakes that the engineers can control the speed, and that the use of hand brakes on such grade is a violation of the act. This contention disregards the purpose of the railroad as disclosed by the orders which is not to control the speed, but to insure the safe movement of the trains.

The act of 1893 by its terms was not to take effect until January 1, 1898. By section 7 of that act the Interstate Commerce Commission was authorized to extend the period within which railroads should comply with the act. This was due doubtless to the inability of all the railroads immediately to equip all their rolling stock in the manner prescribed. The act of 1893 was amended by the act of 1903. By the latter the number of cars in any train to have their brakes used and operated by the engineer is fixed at a minimum of 50 per cent. In this respect section 1 of the act of 1893 was amended. In that act the minimum was expressed by "sufficient," a word than which no clearer could be chosen from our language to indicate a minimum quantity, and yet a word indicating various requirements to various men operating railroads under various conditions. It is therefore apparent that one of the purposes of the amendment was to render certain that which was uncertain. If, however, this were not so, yet the power given to the Commission to extend the time for compliance with the original act was not taken away by the later act, but rather affirmed therein by the provision that the Commission could from time to time increase the minimum of 50 per cent. In the exercise of that power the minimum was increased and is now 75 per cent. It seems, therefore, that if a train now has 75 per cent. of its cars used and operated by the engineer, and if there is no other infraction of the law, a jury should not be permitted to find that the train has not a "sufficient" number of cars equipped as required. But whether the train is improperly equipped is a question of fact, and must be proven by the party who asserts the affirmative. This action is a civil action, although for penalties, and there is no greater burden of proof imposed upon the United States than upon the plaintiff in any other civil action. In none of the 21 causes of action was any evidence offered that the train was not equipped as provided by law, as the court understands it. As to the great majority, the witnesses on the part of the plaintiff testified to facts showing proper equipment. As to the few, the evi-

dence (given with respect to all) that hand brakes were operated on the long Sand Patch grade, was the only parol evidence offered.

Plaintiff contends that evidence of the use of hand brakes is all that need be shown to justify the submission to the jury of the question whether the train was properly equipped. It was not shown that the hand brakes were used to control the speed of the train. The burden was upon the plaintiff to show this. Plaintiff's evidence tended to show the contrary. That the act of 1893 and its amendments did not prohibit the use of hand brakes is clear. There is no such prohibition in them. The first section of the act of 1893 intends that the engineer should control the speed of the train without requiring brakemen to use the common hand brake for that purpose. The power to the Interstate Commerce Commission to extend the time for compliance with the act and to enlarge the minimum requirement, and the indefinite extension as indicated by fixing the minimum at 75 per cent., all support the same view.

Plaintiff offered in evidence two orders issued by the defendant to its locomotive engineers and trainmen and which were in effect upon the defendant's railroad at the time at which the alleged violations of the act occurred. The material portions of these orders are as follows:

"Trains must have the air brakes operative on not less than 75% of the cars in the train, which must be tested as follows:

"'As soon as the locomotive is coupled to the train and the pressure is equalized throughout the train, the engineer upon request of a trainman or inspector, will make a full service application (25lb. reduction of pressure) of the brakes, and hold them on until the trainmen or inspectors have examined the brakes on the tender and on each car.'

"This must be done at the points designated in order to know, before starting, that brakes are in good condition.

"Trains on descending grades must be controlled by use of the air brakes, supplemented by the application of such hand brakes as may be necessary to insure the safe movement of the train.

"The conductor must be in his proper place out on the train, and will be held responsible for properly instructing the trainmen, and know that they are located at their appropriate stations on the train, and that the handles of the pressure retaining valves on each car in the train are turned to the position for service as may be required.

"The conductor must also assist in holding the train, by the application of hand brakes, when necessary.

"Sufficient hand brakes must be applied at the top of grade and so manipulated on the descending grades that in controlling the speed of the train by the air brake, the full application will not be necessary, thus leaving some reserve power within control of the engineer.

"These instructions are issued to prevent excessive heating of car wheels, thus reducing the liability for accident from such a cause.

"On freight trains descending the eastern slope of the mountain, trainmen must not leave the hand brakes applied to any car for the entire distance from Sand Patch to Hyndman.

"When leaving Sand Patch, commencing with the head end of the train, a sufficient number of hand brakes must be applied on alternate cars to properly supplement the air brakes (see Circular of February 10th, 1908, to locomotive engineers and trainmen), and the number of hand brakes so set must be left applied until the train reaches Glencoe. .

"At Glencoe, the hand brakes on alternate cars will be applied and released, successively, until all hand brakes applied at Sand Patch have been released and a like number have been set.

"On arrival at Hyndman, all hand brakes must be released.

"Trainmen must at all times make close observation for indications of extreme heating of wheels due to either hand or air brakes and must change the hand brakes or pressure retaining valves at any points between Sand Patch and Hyndman if necessary to prevent excessive heating of wheels."

These orders having become part of plaintiff's case, evidence of the use of hand brakes, in the absence of evidence that the trains were not properly equipped, was evidence only that the orders were being obeyed, that the trainmen were insuring the safe movement of the train, and that they were anticipating "emergencies which might arise from unforeseen and wholly exceptional cases."

The plaintiff called witnesses McManamy and Ensign as experts to show that such orders were not necessary or reasonable, but their testimony is not entitled to weight for the reason that the former "had no experience on Sand Patch grade," and did not know anything about the average tonnage per brake on defendant's railroad, and the latter did not know the practice in the operation of air brakes on Eastern mountain grades.

The question raised by the plaintiff in the 21 causes has not been decided in any jurisdiction. It is urged, however, that the air brake provision is so similar to the coupler provision of the act (in the second section) that decisions construing the latter should apply to the former. The coupler provision of the act makes it unlawful to use any car in interstate traffic "not equipped with couplers coupling automatically by impact, and which can be uncoupled without the necessity of men going between the cars." Clearly it prohibits the use of certain couplers. As stated in Johnson v. Southern Pacific Company, 196 U. S. 19, 25 Sup. Ct. 158, 49 L. Ed. 363, the test of compliance is whether men must go between the cars to couple or uncouple them. The act does not prohibit men from going between the cars. It is a well-known fact, and admitted by plaintiff at the trial, that men are required to go between the cars for the purpose of connecting the air line of the power brake system in use as required by the act. Proof of the mere fact that men would go between the cars would not be proof that the couplings were not such as were required. Just as in the case at bar, proof of the mere fact that hand brakes were used on the Sand Patch grade would not be evidence that the trains were not properly equipped with the requisite number of power brake cars. There appears to have been no error in regard to the 21 causes of action.

With respect to the second cause of action, however, as has been said, a different question is presented. It is averred in plaintiff's statement of claim that, while the train had 75 per cent. of its cars used and operated by the engineer, there were associated together in said train with said 75 per cent. four additional train brake cars which did not have their brakes operated by the engineer. This charges a breach of the provisions of section 2 of the act of March 2, 1903, above quoted. It was admitted at the trial that said four cars were defective and out of repair. It did not appear how long their brakes had been unused. The testimony showed that they had their air "cut out"—that is, cut off in the pipes extending from the main air line of the train to the brakes. The air was not interfered with in passing through said cars to other cars. It seems plain that with brakes cut

out for defects they ceased to be power braked cars and became part of the allowed percentage of hand braked cars. The act nowhere imposes a penalty for using an air braked car with a cut out brake, as it does for using one with a defective coupler, or one without grab irons or handholds. Again, the act does not say all power braked cars in a train shall have their brakes used and operated. There is a qualification which must mean that only such power braked cars "which are associated together with said" 75 per cent. shall have their brakes used. That clearly contemplated that there might be some power braked cars not associated with the 75 per cent., which need not have their air brakes used and operated. All the cars in the train, except the four cut-out cars, and the caboose, not complained of, were associated together in the air brake operations by the engineer of the locomotive. When the Interstate Commerce Commission shall, in the exercise of its powers, fix a minimum percentage of cars in any train required to be operated with power or train brakes, which must have their brakes used and operated as required by the act, at a minimum much greater than that which now is the standard, there may be some right to recover upon a cause of action in which the allegations and proofs are similar to those in the case at bar.

Inasmuch, therefore, as the plaintiff did not offer evidence sufficient to sustain a verdict upon any one of the several causes of action, the motion to take off the nonsuit must be refused.